## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| SHONA THOMAS and MEGAN REYNOLDS, individually and on behalf of all other similarly situated individuals,<br><br>        Plaintiffs,<br><br>v.<br><br>ARC AUTOMOTIVE, INC., TOYODA GOSEI NORTH AMERICA, INC., GENERAL MOTORS, HYUNDAI MOBIS CO., LTD., MOBIS PARTS AMERICA, LLC, HYUNDAI MOTOR CO., LTD., HYUNDAI MOTOR AMERICA, INC., HYUNDAI-KIA AMERICA TECHNICAL CENTER, INC.,<br><br>        Defendants. | Case No.:<br><br>CONSUMER CLASS ACTION COMPLAINT<br><br>Jury Trial Demanded |

## I.  <u>SUMMARY OF THE CASE</u>

1.     ARC Automotive, Inc. ("ARC") produces toroidal stored gas hybrid inflators which have been installed in tens of millions of airbags used in vehicles made by several automakers, including GENERAL MOTORS ("GM"), HYUNDAI MOTOR CO., LTD., and HYUNDAI MOTOR AMERICA, INC. (the "Hyundai Defendants").

2.     Plaintiffs and the Class purchased vehicles containing airbags with ARC toroidal stored gas hybrid inflators. The specific vehicles at issue in this case include the 2008-2017 Buick Enclave and 2009-2016 Hyundai Elantra models (the "Class Vehicles").

3.    Unknown to Plaintiffs and the Class, the ARC inflators equipped in the Class Vehicles have a potentially deadly design defect that can cause the airbags to rupture and shoot metal shrapnel into the occupant cabin (the "Inflator Defect").

4.    The Inflator Defect is the result of multiple flawed design decisions that cause or lead to over-pressurization, which in turn can lead to ruptures. First, the company chose to use phase-stabilized ammonium nitrate ("PSAN") in its propellant—a chemical so volatile that even ARC now belatedly acknowledges that its use in airbag inflators is "no longer acceptable." ARC compounded the error by specifying the use of an improperly designed friction welding process to weld the two halves of the inflator shell together. ARC's friction welding process was faulty because it failed to minimize, identify, and remove "flash," which refers to metal fragments that splash out of the weld and harden in other places within the inflator. The "flash" can block the exhaust port, causing or exacerbating over-pressurization that ruptures the canister. ARC then further compounded that error by failing to use alternative designs which could have mitigated the volatility of PSAN, including the use of pressure relief valves in its inflators.

5.    The Inflator Defect is present in ARC's toroidal stored gas hybrid inflators equipped in both driver and passenger airbags (the "Defective Inflators"). These airbag modules are manufactured by other suppliers, such as TOYODA GOSEI NORTH AMERICA, INC. ("Toyoda Gosei"), HYUNDAI MOBIS CO., LTD. and MOBIS PARTS AMERICA, LLC (the "Mobis Defendants"), and then installed in vehicles, including the Class Vehicles.

2

6. The Inflator Defect poses a severe danger to Plaintiffs and the Class. So far, two deaths and multiple severe injuries have been connected to the Inflator Defect. Those incidents, in turn, have resulted in an ongoing investigation by the National Highway Traffic Safety Administration ("NHTSA"), as well as multiple limited recalls.

7. Plaintiffs and the Class had no reasonable means to ascertain the Inflator Defect, and as such, purchased vehicles they either would not have purchased, or paid more for those vehicles than they otherwise would have, had they been warned about the Inflator Defect.

8. Plaintiffs bring this action to obtain financial compensation for those who expended money for defective vehicles, as well as to obtain equitable relief to make their vehicles safe and to prevent Defendants from further profiting at the expense of their customers' safety.

## II.    PARTIES, JURISDICTION, AND VENUE

9. Defendant ARC is incorporated in Delaware and maintains its principal place of business in Tennessee.

10. Defendant TOYODA GOSEI NORTH AMERICA, INC. is incorporated in Michigan and maintains its principal place of business in Michigan.

11. Defendant GM is incorporated under the laws of Delaware and maintains its principal place of business in Michigan.

12. Defendant HYUNDAI MOBIS CO., LTD., is a South Korean company with its principal place of business in Seoul, South Korea. Hyundai Mobis Co., Ltd.,

is an affiliated company of Hyundai Motor Co., with each company owning a significant portion of the other's shares.

13.    Defendant MOBIS PARTS AMERICA, LLC is a Delaware limited liability company with its principal place of business in Fountain Valley, California.

14.    HYUNDAI MOBIS CO., LTD., is the sole owner of MOBIS PARTS AMERICA, LLC, which HYUNDAI MOBIS CO., LTD., created and operates to promote its business interests within the United States, including throughout Illinois. Collectively, these Defendants shall be referred to as the "Mobis Defendants."

15.    Defendant HYUNDAI MOTOR CO., LTD., is a South Korean company with its headquarters in Seoul, South Korea. HYUNDAI MOTOR CO., LTD. designs, develops, tests, manufactures, and exports Hyundai brand vehicles that are sold throughout the United States. When vehicles are manufactured overseas but are intended for sale in the United States, Hyundai Motor Co. ensures, through design and compliance testing, that the vehicles comply with U.S. regulations and safety standards. Hyundai Motor Co. owns 33.88 percent of Kia Corporation, making it the largest investor in the company.

16.    Defendant HYUNDAI MOTOR AMERICA, INC., is a California corporation with its principal place of business in Fountain Valley, California.

17.    HYUNDAI MOTOR CO., LTD., wholly owns and operates HYUNDAI MOTOR AMERICA, INC. to market, promote, and sell Hyundai brand vehicles throughout the United States, including in Illinois. Collectively, these Defendants will be referred to as the "Hyundai Defendants."

18.    HYUNDAI-KIA AMERICA TECHNICAL CENTER, INC. ("HATCI") is incorporated under the laws of Michigan and maintains its principal place of business in Superior Township, Michigan. HATCI is wholly owned by HYUNDAI MOTOR CO., LTD. and is "the core research base for production and sales support in North America. The facility is the hub for designing, planning and overall development of Hyundai automobiles specifically intended for the North American market."

19.    Plaintiff Shona Thomas resides in Maywood, Illinois. She purchased a 2012 Hyundai Elantra in Illinois in 2012. At the time of purchase, she did not know her vehicle's airbag was affected by the Inflator Defect. Had she known of the Inflator Defect, she would have either not purchased the vehicle, or would have paid significantly less to do so.  Her airbag module was manufactured by the Mobis Defendants.

20.    Plaintiff Megan Reynolds resides in Decator, Illinois. She purchased a 2017 Buick Enclave in Illinois in or around 2015. At the time of purchase, she did not know her vehicle's airbag was affected by the Inflator Defect. Had she known of the Inflator Defect, she would have either not purchased the vehicle, or would have paid significantly less to do so. Her airbag module was manufactured by Toyoda Gosei.

21.    This case presents minimal diversity and the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and as such, this Court has diversity jurisdiction under the Class Action Fairness Act (28 U.S.C. § 1332(d)(2)(A)).

22.    ARC is subject to jurisdiction before this Court because:

a. ARC's business model revolves around distributing, supplying, and servicing inflators which are necessarily installed and equipped in airbags that are used in vehicles sold and used throughout the United States, including within Illinois.

b. ARC cultivated and maintains a market within Illinois for its airbag parts and accessories, including through profitable business relationships with dealerships, retailers, service facilities, and other automotive businesses across Illinois.

c. ARC maintains lucrative business relationships with each other Defendant, knowing that those Defendants use ARC's products in vehicles they market, sell, and service throughout Illinois.

d. ARC supplied and distributed the Defective Inflators with the intent and expectation that they be sold and used throughout the nation, including within Illinois.

e. ARC regularly inspects, investigates, services, and otherwise assists its business partners as part of warranty claims, root cause defect investigations, and other similar tasks with regard to claims and incidents arising in Illinois—which it is required to do in order to maintain its profitable relationships in the automotive industry.

f. Plaintiffs and the Class purchased or leased Class Vehicles with defective airbag inflators supplied by ARC within Illinois.

23. Toyoda Gosei is subject to jurisdiction before this Court because:

a. Toyoda Gosei's business model revolves around distributing, supplying, and servicing automotive components and accessories, including airbag modules using ARC's Defective Inflators, throughout the United States, including within Illinois.

b. Toyoda Gosei cultivated and maintains a market within Illinois for its airbag parts and accessories, including through profitable business relationships with dealerships, retailers, service facilities, and other automotive businesses across Illinois.

c. Toyoda Gosei maintains lucrative business relationships with each other Defendant, knowing that those Defendants use Toyoda Gosei's products in vehicles they market, sell, and service throughout Illinois.

d. Toyoda Gosei supplied and distributed the airbag modules at issue in this case with the intent and expectation that they be sold and used throughout the nation, including within Illinois.

e. Toyoda Gosei regularly inspects, investigates, services, and otherwise assists its business partners as part of warranty claims, root cause defect investigations, and other similar tasks with regard to claims and incidents arising in Illinois—which it is required to do in order to maintain its profitable relationships in the automotive industry.

    f.  Plaintiffs and the Class purchased or leased Class Vehicles with defective airbag modules supplied by Toyoda Gosei within Illinois.

24.    The Mobis Defendants are subject to jurisdiction before this Court because:

    a.  They are registered to and/or do conduct significant business within the state of Illinois. Mobis Parts America, LLC, has been active to conduct business in Illinois since 2009.

    b.  Their business model revolves around distributing, supplying, and servicing automotive components and accessories, including airbag modules using ARC's Defective Inflators, throughout the United States, including within Illinois.

    c.  They maintain lucrative business relationships with each other Defendant, knowing that those Defendants use the Mobis Defendants' products in vehicles marketed, sold, and serviced throughout Illinois.

    d.  They cultivated and maintained a market within Illinois for their airbag parts and accessories, including through profitable business relationships with dealerships, retailers, service facilities, and other automotive businesses across Illinois

    e.  They supplied and distributed the airbag modules at issue in this case with the intent and expectation that they be sold and used throughout the nation, including within Illinois.

f. They regularly inspect, investigate, service, and otherwise assist their business partners as part of warranty claims, root cause defect investigations, and other similar tasks with regard to claims and incidents arising in Illinois—which they are required to do in order to maintain their profitable relationships in the automotive industry.

g. Plaintiff and the Class purchased or leased Class Vehicles with defective airbag modules supplied by the Mobis Defendants within Illinois.

25. GM is subject to jurisdiction before this Court because:

a. GM is registered to and does conduct significant business within the state of Illinois.

b. GM's business model revolves around designing, developing, manufacturing, testing, distributing, supplying, and servicing vehicles, including vehicles with ARC's Defective Inflators, that are sold throughout the United States, including within Illinois.

c. GM maintains an extensive network of dealerships throughout Illinois which market, sell, lease, and service vehicles in the state, including the Class Vehicles.

d. Plaintiffs and the Class purchased and/or leased Class Vehicles manufactured and marketed by GM within Illinois.

26. The Hyundai Defendants are subject to jurisdiction before this Court because:

a. They are registered to and/or do conduct significant business within the state of Illinois. HYUNDAI MOTOR CO., LTD. itself was registered as a foreign entity authorized to conduct business in Illinois from August 2000 through January 2006, during which time, HYUNDAI MOTOR CO., LTD. first began using the Defective Inflators in its vehicles sold in the United States. HYUNDAI MOTOR AMERICA, INC., has been registered as active to conduct business in Illinois since 1986.

b. Their business model revolves around designing, developing, manufacturing, testing, distributing, supplying, and servicing vehicles, including vehicles with ARC's Defective Inflators, that are sold throughout the United States, including within Illinois.

c. They maintain an extensive network of dealerships throughout Illinois which market, sell, lease, and service vehicles in the state, including the Class Vehicles.

d. Plaintiffs and the Class purchased or leased Class Vehicles manufactured and marketed by the Hyundai Defendants within Illinois.

27. Venue is proper under 28 U.S.C. § 1391(a)-(c) because the Defendants do substantial business within this District, including by distributing, marketing, selling, and servicing Class Vehicles throughout the District.

## III.    GENERAL ALLEGATIONS

**A.    The Class Vehicles' ARC inflators are defective due to the use of PSAN, faulty friction welding, and lack of pressure relief valves**.

28.    Airbags are supposed to help protect the driver or passengers in the event of a crash, preventing them from striking the inside of the car or other objects. To achieve this result, the airbag must "fire" during an impact and inflate the cushion with gas.

29.    Airbags "fire" because they are equipped with inflators, which are small metal canisters that contain chemical propellant. ARC's toroidal stored gas hybrid inflators also contain highly compressed gas. During a crash, the propellant heats the gas, which in turn fills the airbag cushion with air.

30.    ARC's inflators, both driver-side and passenger-side, are "toroidal," which means that their shape resembles a small, circular can. The inflator and propellant are located within that can. As will be discussed below, the toroidal inflator is formed through a "friction welding" process that fuses two metal shells together.

31.    At all relevant times, there existed a wide array of economically and technologically feasible airbag propellant chemicals. PSAN is among the cheapest— but most volatile—of the available options.

32.    The dangers of PSAN's volatility were well-evidenced in the Takata airbag recalls—which began over a decade ago and are still in effect through today and constitute the largest automotive recall in U.S. history. ARC, as well as the airbag module suppliers and the OEMs, knew of those recalls and the sprawling

nationwide litigation that accompanied those recalls, because they were widely reported in the press and within the industry.

33.    ARC has acknowledged multiple times via patent filings that ammonium nitrate is unstable and undergoes dangerous phase changes.

34.    ARC's 1995 patent application entitled "Eutectic Mixtures of Ammonium Nitrate and Amino Guanidine Nitrate" acknowledged that ammonium nitrate "undergoes certain phase changes during temperature variations causing cracks and voids if any associated binder is not sufficiently strong and flexible to hold the composition together."

35.    ARC's 1998 patent application entitled "Nonazide Ammonium Nitrate Based Gas Generant Compositions that Burn at Ambient Pressure" acknowledged that PSAN "is a problem since many gas generant compositions containing this oxidizer have unacceptably low melting points and are thermally unstable."

36.    ARC's 2018 patent application entitled "Non-Ammonium Nitrate Based Generants" acknowledged that:

> With ammonium nitrate based generants becoming unacceptable for usage in automotive airbag inflator applications regardless whether they are used in pyrotechnic or hybrid type inflators, alternate or non-ammonium nitrate containing generants are highly desirable. Even in a hybrid inflator where the generant is stored in a high-pressure inert gas atmosphere making moisture intrusion nearly impossible, ammonium nitrate based generants are still considered unacceptable.

37.    Despite its knowledge of PSAN's extreme volatility and the deaths and injuries caused by airbags using PSAN-based propellants, ARC nonetheless chose to continue using PSAN-based propellant up through at least 2020.

38.    The volatility of PSAN causes it to burn faster than other more commonly used propellants as pressure increases within the inflator. The faster burn rate exacerbates over-pressurization caused by issues such as vent blockages. Over-pressurization, in turn, can cause the canister to explode should it reach a point where the canister is unable to withstand the forces exerted on it. As the canister explodes, the metal shatters into fragments which can then be expelled through the airbag cushion and toward the driver and passengers. This sequence of events is commonly referred to as a "rupture."

39.    PSAN's dangerous volatility renders it an unsuitable and defective design choice for an airbag propellant chemical because its behavior is only predictable in precise conditions. Many mechanical, usage, and environmental factors can lead to de-stabilization and, consequently, over-pressurization of the canister.

40.    PSAN is so vulnerable to over-pressurizing the canister because its burn rate acts as a force multiplier: when PSAN is exposed to increasing pressure, it exponentially responds, rapidly accelerating and increasing the pressurization within the inflator canister. Other propellant chemicals do not have this exponential response to pressure increases.

41.    Given its dangerous characteristics, PSAN should not be used in an airbag inflator propellant; but if it is used, the surrounding conditions and components must be meticulously designed to avoid over-pressurization given the force-multiplier effect PSAN has in response to increasing pressure. But ARC failed to do so. Instead, ARC made several additional design decisions that made the

13

Defective Inflators even more prone to rupture than they would have been with just PSAN alone.

42.    As part of the design of the Defective Inflators, ARC specified and mandated the use of an improperly designed friction welding process to fuse the canister's two metal shells together. Those shells, when welded together, form the toroidal housing which contains the chemicals and components, all of which collectively comprises the inflator.

43.    ARC's friction welding process used rapid rotation to generate heat, which softens the metal and allows the two halves to be fused together. The problem is that some of the softened metal splashes outside of the weld location during the rapid rotation, leading to hardened metal pieces, called "weld flash" or simply "flash," forming outside of the weld area. When the flash forms on the internal welds that fuse the central support column together, it cannot be seen through a visual inspection. Manufacturers may specify friction welding parameters that ensure internal flash is either prevented during welding or removed after the weld is complete. ARC did not take such measures.

44.    During a deployment, these internal flash pieces can fall off the inflator in the central support column and partially or wholly block the exit orifice through which the gas escapes the canister. When this occurs, pressurization within the inflator begins to increase. The increasing pressure can then be exacerbated and multiplied by the volatile PSAN-based propellant.

45.    While recalling a certain lot of ARC's inflators in 2017, Ford observed that its "[p]reliminary analysis indicates that weld flash from the inflator canister welding process at the Tier 2 inflator supplier [ARC] may obstruct the gas exhaust port."

46.    One of the ways ARC could have mitigated the dangers of its choice of PSAN-based propellant and a poorly designed friction welding process would have been to install pressure relief valves, which would have relieved the metal canister of the forces being exerted on it, lowering the likelihood of a rupture.

47.    For instance, one of the few other inflator manufacturers to ever use PSAN-based propellant, TRW, incorporated a pressure relief valve which allowed gas to escape in the event of over-pressurization back in the early 2000s. As such, the use of a relief valve was and has been a feasible alternative design for nearly two decades—predating the time period in which the Class Vehicles were designed and manufactured.

48.    Indeed, ARC's patent applications reveal that it has also long known that pressure relief valves are a viable design feature that can mitigate the risk of over-pressurization during inflation. For instance, ARC's 2013 patent application entitled "Variable Orifice Construction" described a design which would allow the size of the inflator's exit orifice to increase along with the gas pressure inside the inflator.

49.    Similarly, ARC explained in its 2020 patent application entitled "Airbag Inflator With Pressure Relief Valve and Increased Combustion Efficiency" that:

> Some existing inflator assemblies utilize a center support structure that
> requires two simultaneous welds, which is problematic in respect of

manufacturing and also increases the potential for weld particles to exit the inflator upon deployment. Existing designs have also been configured to fragment during deployment as a consequence, in the event of excessive pressure increase within the inflator due to some failure or external condition or the like, these existing inflator designs can be potentially hazardous for vehicle occupants.

* * *

It would be desirable to provide an airbag inflator that reduces gaseous effluents with efficient combustion while incorporating additional safety features in respect of venting and unintended increases in internal pressure and weld particles.

50.    ARC's 2020 patent application described a hybrid inflator design which had a series of vent holes and sub-chambers that would allow for ventilation, along with "flow diverters" that could "direct and control pressure and flow"—all of which would help prevent over-pressurization.

51.    In short: ARC chose to use a dangerous, highly volatile chemical, PSAN, in its propellant. It then compounded this danger by specifying, as part of the product's design, an inadequate friction welding process that can generate flash which, in turn, can block exhaust ports and lead to over-pressurization—which would then be amplified by the PSAN's volatile nature. And ARC further failed to incorporate pressure relief valves to mitigate the dangerous combination of PSAN and ARC's friction welding design specification.

**B.    The Defendants profited from the sale of the Class Vehicles by concealing the existence of the Inflator Defect.**

52.    ARC is a "Tier 2" supplier, meaning that it provides a subcomponent (airbag inflators) to a "Tier 1" supplier, Toyoda Gosei and the Mobis Defendants in this case, which then assembles the inflator into an airbag module. The Tier 1

supplier then provides the airbag module to the vehicle manufacturer, referred to as an "Original Equipment Manufacturer" or "OEM," GM and the Hyundai Defendants in this case.

53.    Toyoda Gosei assembled ARC's Defective Inflators into airbag modules which GM then placed into 2008-2017 Buick Enclave Class Vehicles.

54.    The Mobis Defendants assembled ARC's Defective Inflators into airbag modules which the Hyundai Defendants then placed into 2009-2016 Hyundai Elantra Class Vehicles.

55.    The working relationship between the Tier 2 supplier, Tier 1 supplier, and OEM requires an extensive exchange of information between each company. This process begins at the top, as the OEM provides design and engineering specifications and performance requirements that must be satisfied. The Tier 1 supplier, in turn, completes the "Production Part Approval Process" or "PPAP," which is compilation of design and process testing that demonstrates to the OEM that the product meets its specifications.

56.    As part of conforming to the OEM's PPAP requirements, the Tier 1 supplier requires proof from the Tier 2 supplier that its component has also met the specifications and testing requirements. The Tier 1 supplier then assembles the relevant technical information—its own and the information gained from the Tier 2 supplier—to the OEM for its review and approval.

57.    Additionally, OEMs typically request additional information when an incident occurs in the field (i.e., someone reports an alleged defect in a product that

caused or contributed to an injury or a crash), when excessive warranty claims are filed, or when responding to requests for information from government safety regulators.

58.    Upon information and belief, the Toyoda Gosei, Mobis, GM, and Hyundai Defendants knew of the materials and components used to create the Defective Inflators based on the PPAP specification process described above.

59.    In this case, the Toyoda Gosei, Mobis, GM, and Hyundai Defendants chose to use ARC's Defective Inflators in their airbag modules equipped in the Class Vehicles despite having extensive notice and knowledge that those inflators were dangerous and defective.

60.    The Toyoda Gosei, Mobis, GM, and Hyundai Defendants were further placed on notice of the dangerous design of the ARC inflators—including the use of PSAN, friction welding that did not prevent or remove flash, and the lack of pressure relief valves—as a result of the reported field and lab testing ruptures, recalls, and NHTSA's announcement that it was investigating ARC inflators, as detailed below.

61.    The Toyoda Gosei, Mobis, GM, and Hyundai Defendants knew about the dangerous volatility of PSAN as a result of the record-setting Takata airbag recall for defective PSAN-based inflators, and the sprawling nationwide litigation arising out of the Takata defect.

62.    The dangers of PSAN-based propellant were also highlighted by a prominent 2012 report from researchers at Penn State's High Pressure Combustion Laboratory, which identified and described PSAN's susceptibility to "dynamic

burning"—i.e., PSAN's exponential, force-multiplying response to increased pressure in which the PSAN begins burning more quickly and hotter than expected. The researchers further concluded that the "dynamic burning" process leads to over-pressurization.

63.    As industry participants, all Defendants likely knew of the Penn State Combustion Laboratory 2012 report on PSAN as soon as it was published. At the very latest, they would have learned of the article by 2014, following NHTSA's initiation of its investigation into Takata. They were further made aware of the article through media coverage of Takata, including through the *New York Times* publication of the study in October 2015 as part of the newspaper's series of articles on Takata.

64.    Despite knowing that ARC inflators used PSAN-based propellant and an inadequate friction welding process—and without built-in pressure relief valves—Toyoda Gosei and the Mobis Defendants continued to supply airbag modules with ARC's Defective Inflators to the GM and Hyundai Defendants, which in turn marketed, distributed, and sold those vehicles throughout the nation.

65.    The Defendants have greatly profited from the sale and use of the Class Vehicles, including through the sale and lease of vehicles to Plaintiffs and the Class, who purchased and leased the Class Vehicles without knowing of the Inflator Defect.

66.    Notably, consumers do not have access to the information exchanged between the OEM, Tier 1 supplier, and Tier 2 supplier. As a result, the average reasonable consumer would have no way of knowing that their vehicle's airbags had

inflators which used PSAN-based propellant and were constructed with a faulty friction welding process and without pressure relief valves.

**C.    ARC's Defective Inflators have ruptured in the lab and the field, resulting in multiple deaths and severe injuries.**

67.    Ruptures are extremely rare events which are almost never seen in airbag inflators that do not use ammonium nitrate. ARC's Defective Inflators, on the other hand, have ruptured several times—both during testing and in vehicles that had already been released onto the market.

68.    Given their rare nature, a single rupture is cause for concern, and more than one rupture evidences a fundamental design defect.

69.    So far, there have been at least seven reported ruptures of ARC's Defective Inflators in consumer vehicles "in the field" (meaning that the ruptures occurred in vehicles that had been distributed and sold, rather than during production or testing) and two that occurred during testing. Upon information and belief, the reported ruptures are not the only ones that have occurred; they are just the only ones that have been reported to date. These ruptures began occurring just as the Takata investigation was getting underway, which should have caused alarm among the Defendants.

70.    Two of the known field ruptures resulted in the death of the person driving the vehicle.

71.    The earliest reported field rupture occurred during a 2009 Ohio crash involving a 2002 Chrysler Town & Country van. The ruptured inflator was in the

driver's side airbag. The public reports associated with this crash do not reveal whether the driver sustained injuries.

72.    In 2014, another driver-side ARC inflator ruptured in a 2004 Kia Optima in New Mexico, causing serious injuries to the driver. The driver filed a personal injury lawsuit against Kia and ARC, which both quickly and quietly settled the lawsuit.

73.    Another ARC inflator field rupture occurred in 2014, but none of the circumstances involved in that incident have been made public.

74.    In 2016, a driver in Canada was killed when the ARC inflator in a 2009 Hyundai Elantra ruptured during a crash, prompting a recall of certain 2009 Elantra vehicles in Canada (but not in the U.S.).

75.    In 2017, an ARC driver's side inflator equipped in a 2011 Chevrolet Malibu ruptured during a crash in Pennsylvania. GM subsequently recalled certain 2010-2011 Chevrolet Malibu vehicles that had inflators from the same lot as the one which had ruptured. GM also quickly and quietly settled the subsequent product liability lawsuit brought by the driver.

76.    Two of ARC's passenger inflators also ruptured during testing in 2017. Those ruptures prompted two separate recalls, one by BMW and another by Ford.

77.    The second reported fatality occurred during a 2021 Michigan crash when the driver-side ARC inflator in a 2015 Chevrolet Traverse ruptured and killed a mother of ten, with four of her children in the vehicle with her. The police report

states that parts of the metal inflator were found lodged in the driver's neck during the autopsy, and that:

> It appeared that the driver's side airbag malfunctioned causing it to detach from the steering column and sent metal fragments into the driver's compartment of the vehicle. The igniter for the front driver's side airbag was found on the passenger side dashboard. There was also metal shrapnel on the driver's side dash, in the instrument cluster and markings on the driver's side roof which appeared to come from the driver's side airbag.

78.    Another rupture occurred in California in 2021, resulting in severe laceration injuries to the front seat passenger in a 2016 Audi A3. The passenger filed a personal injury lawsuit, which remains pending. Volkswagen issued a limited recall following this rupture.

79.    Notably, the ruptures described above occurred in various locations, in various makes and models of vehicles, and during both lab testing and real-world conditions.  The inflators themselves were manufactured in varying time frames and different global factories. The consistent theme in all of the ruptures is the Defective Inflators' use of PSAN-based propellant and friction welding without any pressure relief valves.

80.    Despite the constant variable in the known ruptures being the use of the Defective Inflators, none of the Defendants have recalled all vehicles using this same inflator design. Instead, they've issued limited recalls as they continue to remain under investigation by NHTSA.

**D.    ARC's Defective Inflators have been the subject of multiple recalls and an ongoing NHTSA investigation.**

81.    NHTSA opened its Preliminary Investigation (PE15-027) of 490,000 ARC hybrid inflators in July 2015, stating that those inflators "may rupture" and cause "metal fragments" to be "propelled into the passenger compartment." The Agency reported that it began looking into the issue after receiving reports of the 2009, 2014, and 2015 ruptures described above.

82.    In August 2016, NHTSA upgraded the Preliminary Investigation into a more detailed Engineering Analysis (EA16-003) after learning about the fatal 2016 rupture that killed a Canadian driver.

83.    The NHTSA investigation remains ongoing to this day, with no conclusions yet published. NHTSA has likewise not released many investigation materials, though it has published letters sent to OEMs, Tier 1 Suppliers, and ARC without publishing their responses.

84.    In an October 4, 2016 letter, NHTSA admonished ARC for failing to disclose rupture incidents as required by law, and otherwise impeding the investigation, stating: "[B]eyond ARC's lax response to compulsory process, ARC's attitude and approach to the Agency's investigation remains troubling." The agency elaborated:

> Since this investigation was opened, ARC has on more than one occasion questioned the necessity of providing certain information, failed to provide documents in a readable format, appeared nonchalant in its approach to developing a testing plan or protocol, and has advocated for the closure of the investigation without possessing or providing a full understanding of the root cause for at least one of the underlying inflator ruptures.

Additionally, a number of incidents involving ARC's product have been brought to NHTSA's attention by vehicle manufacturers and other suppliers. These incidents range from testing failures to recalls, and raise serious questions regarding the quality and integrity of ARC's air bag inflators. While vehicle manufacturers and other suppliers have voluntarily notified NHTSA of these and other incidents without the need for a formal request, ARC has failed to take any steps to notify the Agency of these incidents, or their potential relationship to the incidents under investigation. After the Agency learned of one of these incidents earlier this year, the Agency contacted ARC and indicated that the company needed to provide this type of information to NHTSA proactively. Instead of noting the serious nature of these incidents and committing to work with NHTSA to determine the appropriate range of issues at hand, ARC's counsel stated that they had no obligation to provide such information and chastised Agency staff for indicating otherwise.

Compounding ARC's failure to inform the Agency of these matters, ARC has also failed to comply with Standing General Order 2015-02A, issued in the underlying Preliminary Evaluation, which requires ARC to file a report within five days of receiving notification of an inflator field rupture. On July 8, 2016, a fatal rupture occurred in Newfoundland, Canada. NHTSA was notified of this incident on by both Transport Canada and by Hyundai. Although ARC was clearly notified of the incident, as demonstrated by ARC's attendance at an inspection of the vehicle that occurred on July 26, 2016, ARC has failed to provide any report to NHTSA regarding that incident. As noted by the Standing General Order, failure to comply with that obligation calls for the imposition of daily civil penalties.

ARC's response to the Agency's investigation to date does not demonstrate the behavior that NHTSA expects of manufacturers, must less manufacturers of vital safety components utilized in vehicles across the globe. To the contrary, ARC's behavior has demonstrated a lack of cognizance regarding the seriousness of this investigation and the underlying issues. ARC has been given every consideration, yet has failed to respond in kind.

85.    Although the NHTSA investigation remains ongoing, several OEMs have already issued recalls for limited subsets of vehicles equipped with ARC's

Defective Inflators. All recalls were limited to only those vehicles that contained an inflator in the same lot as a ruptured inflator.

86.    BMW recalled certain 2017 X5 models following a rupture in ARC's internal testing facilities in March 2017.

87.    Ford recalled certain 2017 F150 and Mustang models following a rupture in ARC's internal testing facilities in August 2017.

88.    GM has issued three recalls related to ARC's Defective Inflators, including limited subsets of the 2010-2011 Chevrolet Malibu in January 2019; certain 2013-2017 Chevrolet Traverse and 2008-2017 Buick Enclave models in October 2021; as well as a limited subset of 2015 Traverse, Enclave, and Acadia models in April 2022.

89.    Volkswagen recalled certain 2016 Audi TT, Audi TT Roadster, TT Coupe, S3 Sedan, R8 Coupe, A3 Sedan, A3 Sportback e-tron, A3 Cabriolet, Golf SportWagen, Golf R, Golf GTI, Golf Mk7, and battery-electric e-Golf hatchback models in July 2022 following the 2021 California ARC inflator rupture resulting in severe physical injury.

## IV.    CLASS ACTION ALLEGATIONS

90.    **Class Definition.** Pursuant to F.R.C.P. 23(b)(2) and 23(b)(3), Plaintiff will seek certification of a class consisting of:

> **"All persons who purchased or leased a 2013-2017 Buick Enclave or 2009-2016 Hyundai Elantra in the State of Illinois."**
>
> *(The class definition specifically excludes all persons who assert personal injury claims arising from an alleged defect in one of ARC's Defective Inflators.)*

91.    **Numerosity.** The Class consists of well in excess of 1,000 individuals, making it impractical to join all members into a single litigation as individual plaintiffs.

92.    **Ascertainability.** The Class members can be readily ascertained by review of documents within the Defendants' possession, including sales records, production records, and other similar materials, as well as through registration records and other publicly available means.

93.    **Predominance.** This case presents common questions of law and fact that have answers which are the same for each Class member and predominate over questions affecting each member as an individual, including:

     a.    Whether the Class Vehicles' airbags were equipped with Defective Inflators;

     b.    When the Defendants first learned of the Inflator Defect;

     c.    Whether Defendants concealed the Inflator Defect;

     d.    Whether Defendants had a duty to disclose the Inflator Defect;

     e.    Whether Defendants breached the duty to disclose the Inflator Defect;

     f.    Whether the Inflator Defect would constitute a safety risk or would be otherwise material to an ordinary reasonable consumer considering the purchase or lease of a Class Vehicle;

     g.    Whether an ordinary reasonable consumer would have purchased or leased a Class Vehicle, or if so, whether they would have paid

less to do so, had the Defendants disclosed the Inflator Defect to them;

h.    Whether Defendants misrepresented the safety and performance characteristics of the Class Vehicles;

i.    Whether Defendants' conduct tolls any or all statutes of limitations or other time limitations for the Class to bring claims;

j.    Whether Defendants engaged in unfair or deceptive trade practices;

k.    Whether Defendants issued an express warranty for the Class Vehicles, and if so, whether that warranty encompassed the Inflator Defect;

l.    Whether Defendants breached any express warranties they issued to the Class;

m.    Whether Defendants issued an implied warranty to the Class, and if so, whether that warranty encompassed the Inflator Defect;

n.    Whether Defendants breached any implied warranties they issued to the Class;

o.    Whether the Class Vehicles are unfit for the ordinary purpose for which they are used;

p.    Whether the Class members are entitled to monetary damages, and if so, the amount;

q.    Whether the Class members are entitled to injunctive and declaratory relief, and if so, the type of relief; and

r.    Whether the Inflator Defect caused the Class Vehicles to suffer a diminution in value, and if so, the amount of that diminution.

94.    **Typicality.** Plaintiffs' claims are typical of the claims of the Class members and arise from the same course of conduct by Defendants. The relief Plaintiffs seek is typical of the relief sought for the absent Class members.

95.    **Adequacy.** Plaintiffs will fairly and adequately represent and protect the interest of the Class. Plaintiffs have retained counsel with substantial experience in prosecuting complex civil actions, including actions involving defective products, and have the financial resources to vigorously prosecute this case. Neither the Plaintiffs nor their counsel have interests adverse to those of the Class.

96.    **Superiority.** A class action is superior to the other means available to resolve the issues presented in this case and obtain relief for the Class because:

a.    The Class members suffered relatively small damages when compared with shouldering the burden of filing and litigating an individual lawsuit against larger manufacturers with sophisticated in-house and outside counsel;

b.    The burden and expense of litigating as an individual would—and has, based on electronic nationwide docket searches—prevent individuals from bringing an action, meaning that without class

28

certification, the Class members would have almost no chance of obtaining any relief;

c.      Even if individual actions were feasible, the filing and prosecution of hundreds of thousands of individual cases would greatly overwhelm the judicial system, squandering judicial resources and presenting the spectre of inconsistent results which, in turn, would send conflicting messages as to the appropriate standard of conduct for Defendants and similarly situated manufacturers to adhere to in designing, manufacturing, marketing, selling, and warranting automobiles and automobile components, parts, and equipment.

d.      Prosecuting this case as a class action serves the fundamental purpose of the class action mechanism in that it promotes judicial economy, consistency of results, and fair treatment of individuals who might otherwise lack the practicable ability to have their legal rights vindicated and obtain relief.

97.     **Injunctive and Declaratory Relief.** Defendants acted or refused to act on grounds generally applicable to the Class, making the award of equitable relief and restitution appropriate for the Class.

98.     **Particular Issues.** All common issues identified above are particular and common to all Class members such that resolution of each or all would materially advance the resolution of this action and serve the interests of judicial economy.

## COUNT I: Illinois Consumer Fraud and Deceptive Practices Act
### *Against all Defendants*

99.    Plaintiffs bring this claim individually and on behalf of the Class against all Defendants, realleging paragraphs 1 through 98, for violation of the Illinois Consumer Fraud and Deceptive Business Practices Act ("CFA"), 815 ILCS § 505.

100.    Plaintiffs and the Class are "consumers" as defined by 815 ILCS § 505/1(c).

101.    Defendants are "persons" as defined by 815 ILCS § 505/1(c).

102.    Defendants violated the CFA by participating in misleading, false, and deceptive acts, including by failing to disclose and concealing the Inflator Defect from Plaintiffs and the Class.

103.    Defendants owed a duty to disclose the Inflator Defect because: (i) Plaintiffs and the Class had no way of knowing that the Class Vehicles had airbags subject to the Inflator Defect; (ii) made incomplete representations as to the safety and performance characteristics of the Class Vehicles, including the airbags in those vehicles; and (iii) intentionally concealed the existence of the Inflator Defect.

104.    Defendants' actions in failing to disclose and concealing the defect could mislead an ordinary reasonable consumer as to the safety of the Class Vehicles.

105.    The safety of the Class Vehicles was a material term of the transaction, which necessarily included properly designed airbags that did not suffer from the Inflator Defect.

106.   By failing to disclose the existence of the Inflator Defect, Defendants profited from Plaintiffs and the Class, who would have either not purchased or leased the Class Vehicles or would have paid less to do so.

107.   Plaintiffs and the Class suffered ascertainable losses and actual damages as the direct and proximate result of Defendants' failure to disclose and concealment of the Inflator Defect.

108.   Plaintiffs, individually and on behalf of the Class, seek monetary relief for their actual damages, as well as punitive damages to account for Defendants' fraud and elevation of profits over the safety of consumers, pursuant to 815 ILCS § 505/10(a); injunctive and declaratory relief, including an order enjoining Defendants' conduct described above, pursuant to 815 ILCS § 505/10(c); and attorney's fees and costs, pursuant to 815 ILCS § 505/10(c).

### COUNT II: Illinois Uniform Deceptive Trade Practices Act
### *Against all Defendants*

109.   Plaintiffs bring this claim individually and on behalf of the Class against all Defendants, realleging paragraphs 1 through 98, for violation of the Illinois Deceptive Trade Practices Act ("UDTPA"), 815 ILCS § 505.

110.   Plaintiffs and Defendants are "persons" under 815 ILCS § 510/1/(5).

111.   Defendants violated UDPTA by:

    a.  Failing to disclose and actively concealing the Inflator Defect;

    b.  Representing that the Class Vehicles, including their airbags and airbag inflators, had characteristics, uses, benefits, and quality which they do not have;

    c.  Representing that the Class Vehicles, including their airbags and airbag inflators, are of a particular standard and quality when they are not;

    d.  Advertising the Class Vehicles, including their airbag systems, with the intent to sell or lease them in a different manner than advertised; and

    e.  Otherwise engaging in conduct likely to deceive.

112.   As a direct and proximate result of Defendants' violations of UDTPA, Plaintiffs and the Class were injured in that they purchased or leased the class vehicles when they otherwise would not have, paid more to do so than they otherwise would have, did not receive the benefit of their bargain, and suffered a diminution of value of their vehicles.

113.   Plaintiffs seek an order enjoining Defendants' deceptive practices, attorneys' fees, costs, and any other just and proper relief available under the Illinois UDTPA per 815 ILCS § 510/3.

## COUNT III: Express Warranty
### *Against the GM and Hyundai Defendants*

114.   Plaintiffs bring this claim individually and on behalf of the Class against the GM and Hyundai Defendants, realleging paragraphs 1 through 98, for breach of express warranty.

115.   The Class Vehicles are "goods" under 810 ILCS §§ 5/2-105(1) and 5/2A-103(1)(h).

116.    Defendants were and are "merchants" of motor vehicles under 810 ILCS §§ 5/2-104(1) and 5/2A-103(3), "sellers" of motor vehicles under 810 ILCS § 5/2-103(1)(d), and "lessors" of motor vehicles under 810 ILCS § 5/2A-103(1)(p).

117.    Plaintiffs and the Class Members are "buyers" or "lessees" under 810 ILCS § 5/2-103(1)(a) and 810 ILCS § 5/2-103(1)(n).

118.    As part of the benefit of the bargain in purchasing and leasing each Class Vehicle, Defendants issued an express written warranty that the vehicle would be free of defects in materials and workmanship and repairs would be provided, free of charge, for any defects in materials or workmanship in the airbag.

119.    Defendants breached their express warranty by selling the Class Vehicles with the Inflator Defect, failing to disclose the Inflator Defect, and failing to provide the repairs or replacements needed to remedy the Inflator Defect.

120.    Defendants' breach of warranty directly and proximately caused Plaintiffs and the Class to suffer damages as alleged throughout this Complaint. Accordingly, Plaintiffs, individually and on behalf of the Class, seek all available monetary damages (including actual, compensatory, and punitive damages), injunctive and equitable relief, and attorneys' fees and costs.

## COUNT IV: Implied Warranty
### *Against the GM and Hyundai Defendants*

121.    Plaintiffs brings this claim individually and on behalf of the Class against the GM and Hyundai Defendants, realleging paragraphs 1 through 98, for breach of express warranty.

122.   The Class Vehicles are "goods" under 810 ILCS §§ 5/2-105(1) and 5/2A-103(1)(h).

123.   Defendants were and are "merchants" of motor vehicles under 810 ILCS §§ 5/2-104(1) and 5/2A-103(3), "sellers" of motor vehicles under 810 ILCS § 5/2-103(1)(d), and "lessors" of motor vehicles under 810 ILCS § 5/2A-103(1)(p).

124.   Plaintiffs are "buyers" or "lessees" under 810 ILCS §§ 5/2-103(1)(a) and 5/2-103(1)(n).

125.   Defendants implied a warranty for each Class Vehicle sold or leased in Illinois, including that the vehicle was in a merchantable condition, under 810 ILCS § 5/2-134 and 5/2A-212.

126.   Defendants breached their implied warranty because, as a result of the Inflator Defect, the vehicles are not merchantable, they do not have the quality a buyer would reasonably expect, they would not pass without objection in the automotive trade, they are unsafe to drive and unfit for their ordinary purpose, and they do not conform to their labels' representation that they are safe and suitable for their intended use.

127.   Defendants' breach of warranty directly and proximately caused Plaintiffs and the Class to suffer damages. Accordingly, Plaintiffs, individually and on behalf of the Class, seek all available monetary damages (including actual, compensatory, and punitive damages), injunctive and equitable relief, and attorneys' fees and costs.

## **REQUEST FOR RELIEF**

128.    Plaintiffs, individually and on behalf the Class, request the Court enter Judgement against Defendants as follows:

a.    That this action be certified as a class action, with Plaintiffs as the class representatives, and Plaintiffs' counsel being appointed as counsel for the Class;

b.    A declaration that Defendants' conduct violated the law;

c.    A declaration that Defendants are responsible for notifying the Class about the Inflator Defect;

d.    An injunction requiring Defendants to desist from further engaging in the fraudulent and deceptive conduct alleged in this case;

e.    An award of all available actual damages, compensatory damages, statutory damages and penalties, and punitive damages, including interest, in an amount to be proven at trial;

f.    An award of restitution;

g.    An award of attorneys' fees and costs; and

h.     An award of prejudgment and postjudgment interest.

PLAINTIFFS DEMAND A TRIAL BY JURY.

RESPECTFULLY SUBMITTED,

MEYERS & FLOWERS, LLC.

/s/ Peter J. Flowers
Peter J. Flowers
**MEYERS & FLOWERS, LLC**
3 N. 2nd Street, Suite 300
St. Charles, Illinois 60174
(630) 232-6333 Voice
(630) 845-8982 Facsimile

pjf@meyers-flowers.com

**ATTORNEY FOR PLAINTIFF**